```
1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF CONNECTICUT

3    *  *  *  *  *  *  *  *  *  *   X
                                    *
4    UNITED STATES OF AMERICA,      *   Case No 8CR90(EBB)
                                    *
5              Government,          *
                                    *
6         vs.                       *
                                    *   141 Church Street
7    JOHN N. MILNE,                 *   New Haven, CT
                                    *   September 11, 2013
8              Defendant.           *
                                    *
9    *  *  *  *  *  *  *  *  *   X

10

      TRANSCRIPT OF SUPERVISED RELEASE VIOLATION HEARING
11
     BEFORE:  THE HONORABLE ELLEN BREE BURNS, U.S.D.J.
12

13   APPEARANCES:
     FOR THE GOVERNMENT:       MICHAEL McGARRY, ESQ.
14                             U.S. Attorney's Office
                               157 Church Street
15                             New Haven,  CT 06510

16

17   FOR THE DEFENDANT:        HAROLD JAMES PICKERSTEIN ESQ
                               JAMES SMART, ESQ.
18                             McElroy, Deutsch, Mulvaney &
                               Carpenter
19                             30 Jeliff Lane
                               Southport CT 06890
20

21   ALSO PRESENT:             MARSHA MASSEY, ESQ.
                               LEE GINSBERG, ESQ.
22

23

     Proceeding recorded by mechanical stenography,
24   transcript produced by computer

25
```

1          THE COURT:  We are here with respect to

2    Mr. Milne.

3          MR. MCGARRY:  Yes, your Honor.  Yes,

4    good morning, your Honor.  Mike McGarry from the

5    United States Attorney's Office for the United

6    States of America.  With me at counsel table is

7    legal assistant Amy Konarski.  Also joining us today

8    from the SEC to provide the Court some information

9    is Attorney Marsha Massey.  She's with the

10   Securities and Exchange Commission.  And also I

11   guess representing probation office -- he'll, I

12   guess, introduce himself -- but Mr. Zampano is here.

13         MR. ZAMPANO:  Good morning, your Honor.

14         MR. PICKERSTEIN:  Mr. Milne is here.

15   With me is James Smart of our office and Lee

16   Ginsberg from New York who represents Mr. Milne as

17   well in connection with SEC matters.

18         THE COURT:  All right.  Is Mr. Milne

19   prepared to admit his violation?

20         MR. PICKERSTEIN:  We did admit that,

21   your Honor, at the last hearing back in March.  I

22   think there were two aspects to that.  One was the

23   travel issues that resulted in the initial notice,

24   and we admit that.  Mr. Milne did admit that.

25         The second, as I understand it, is a

1    claim that Mr. Milne is in default of his SEC

2    obligation.  If I can just address that for a

3    moment, your Honor.

4              THE COURT:  Yes.

5              MR. PICKERSTEIN:  There's no question,

6    Mr. Milne was obligated to make a very large payment

7    with the SEC upon his release from incarceration.

8    He has not made that.  There was, however, a

9    negotiated interim agreement with the SEC, an

10   agreement that was negotiated with Ms. Massey in

11   February of this year.  It is captioned Interim

12   Agreement.  Mr. Milne is in complete compliance with

13   that agreement.  Everything that that interim

14   agreement requires Mr. Milne to do, Mr. Milne has

15   done, and we believe more so, including, your Honor,

16   the payment of 17,000-odd dollars this morning to

17   the clerk which represents a percentage of his -- of

18   a fee that he received a few weeks ago, and also

19   there will be a payment of some 14,000-odd dollars

20   -- I don't know the exact detail -- pending in a

21   week or ten days.

22              Your Honor, there's a little bit of -- I

23   know this sounds absurd, but the government

24   subpoenaed Mr. Milne's bank records, as they're

25   certainly entitled to do.  Because of that subpoena,

1  the bank has been reluctant to clear Mr. Milne's

2  checks, and there's a ten-day hold. I don't

3  understand that. I don't know why. That's the

4  bank. So that payment will be made once the check

5  clears.

6  MR. MCGARRY: Your Honor, just for

7  housekeeping matters, referring to the March 14th

8  hearing before your Honor where we were present and

9  Mr. Murphy said -- and, your Honor, obviously he's

10  aware that he has a right to counsel, and if he

11  could confirm that he's waiving his right to a

12  revocation hearing.

13  THE DEFENDANT: Yes, I waive my right to

14  a hearing on the two violations.

15  THE COURT: Okay, we have an admission of

16  violation. Now determination will have to be what

17  the Court should do about that.

18  MR. McGARRY: So it's our understanding

19  that there was an admission on the two violations.

20  I think it's clear that he was not paying and clear

21  on the travel.

22  And if I may continue, your Honor. Just

23  to take a step back, Mr. Milne is here because he

24  was ordered to make disgorgement, and as the Court

25  is well aware, but I'll put on the record,

1    disgorgement is giving back the ill-gotten gains.

2    This is not a fine where he's been asked to come up

3    with new money.  This is disgorgement.  He was

4    ordered to pay, in Document 40 of 8cv505(EBB) before

5    your Honor, as part of the civil matter.  In that

6    final judgment in the civil matter he was ordered to

7    pay 6.25 million, 1 million right away, with the

8    other 5.25 million.

9            As part of the consent, in document No.

10   37 in that case, he agreed that he would pay, in

11   paragraph E on page 2, the entire 6.25 million

12   disgorgement.  And he submitted an attachment A,

13   Schedule A, to Document 37, which lists assets,

14   various assets of holdings of various companies of

15   over $10 million.  And this was filed with the Court

16   October 13th of '09.

17           So we have in the civil case, we have the

18   promise to pay, consent, signed by Mr. Milne, the

19   final judgment by this Court, again to disgorge the

20   amount of money, 6.25 million.

21           Then in the criminal case he agreed -- on

22   page 2, the parties agree that they will recommend

23   to the Court to make the defendant ordered to pay

24   6.25 in disgorgement to the SEC on the terms and

25   conditions in lieu of restitution.  He agreed to

that.

And then this Court in its judgment, paragraph 6, the defendant shall comply with the conditions of the plea agreement. As it relates to the disgorgement, in lieu of restitution, requires the defendant to make payments to the Securities and Exchange Commission of 6.25 million.

If I can go back to the plea agreement, your Honor, I believe that the SEC -- he agreed to make it within three years of the entry of this final judgment. And the consent, which this is October of '09, that he agreed that he would make disgorgement within three years of the date, which would put us into October of '12.

Now we're in September of '13, and he obviously has not complied with making that disgorgement. Now, I guess it obviously raises the question about what happened with the $10 million worth of assets that he represented to this Court that he had. Presumably we will hear that they are gone and that he doesn't have them anymore. But, again, this is ill-gotten gains, this is not a fine.

Again, his background, if I may, your Honor, Mr. Milne, in March of 2010, stood before you on the day of sentencing and said, "I stand here

prepared to pay my debt, my debt to society for my
mistake, and, more importantly, what I longingly
look forward to is the opportunity to come back and
start repaying to everyone, repaying and returning
to society so that I can wake up every day and try
to repair the hurt that I've caused." Those are
words to you.

Since that time he made a million dollar
payment that he was required to do, and in the last
six months he's paid approximately $210,000.

So quick math, at that rate it's going to
take him about 13 years, if every six months he were
able to give $400,000. If every year he were able
to give $400,000 of the 5.2 remaining, $400,000
every year, approximately 13 years to repay a debt
that he agreed to pay, to give back, to disgorge,
within three years of the time he was before this
Court, and he hasn't done that.

Having promised to pay, and having stood
before you in this court and said he's going to wake
up every day to pay, we look at what money is being
spent on. He has a 2013 --

MR. PICKERSTEIN: If I may interrupt. I
think we were dealing with his admission, not the
government's argument as to why something should

1    happen. Mr. McGarry I think wasn't listening to

2    what I was saying and jumped into his argument.

3          MR. McGARRY: That's fine, I'll reserve

4    my argument. That is the background of why we're

5    here -- aside from the travel -- is that the

6    defendant promised to pay, he told the SEC he would

7    pay, he signed a civil judgment to pay, he agreed in

8    a plea agreement to pay, and he spoke in his own

9    words to you, your Honor, saying he would do

10   everything he could to pay, and now we have

11   $5.2 million of nonpayment.

12         THE COURT: Thank you.

13         MR. PICKERSTEIN: We don't deny the fact

14   that he has not paid, your Honor. That's not an

15   issue. He did not pay, but it's not quite as simple

16   as Mr. McGarry would have the Court believe. He is

17   making an effort to pay. The fact remains that at

18   the time that he entered the settlement with the SEC

19   and at the time that he pleaded guilty before your

20   Honor, he had sufficient assets from which the full

21   amount, disgorgement amount, could be paid. He then

22   went to jail. Those assets then became of virtually

23   no value. That's the reality. It is not something

24   over which Mr. Milne has had --

25         THE COURT: Can you explain that, Mr.

1    Pickerstein?  Why were they of no value?

2              MR. PICKERSTEIN:  Yes, your Honor.  Mr.

3    Milne invested in limited partnerships which were

4    assets which had significant value.  There were

5    events that occurred between the time that he

6    surrendered to his sentence and the time of his

7    release which caused those limited partnerships to

8    become of no value.  We have disclosed that to the

9    SEC.  We have disclosed the data with respect to

10   those assets to the SEC and to the government.  He

11   simply doesn't have the money.  He simply doesn't

12   have the money.

13             What did happen, however, what did

14   happen, is in February of 2013, having made full

15   disclosure to the SEC, the SEC entered into the

16   interim agreement, which is what I'm talking about.

17   They recognized that he had an obligation, they

18   recognized that he had promised to pay

19   five-and-a-quarter million dollars, and they also

20   recognized, I think with some degree of common

21   sense, that he didn't have the money.

22             There is no claim in this case, as I

23   understand it, that Mr. Milne is secreting money,

24   hiding money, putting money off shore, transferring

25   it fraudulently.  There's none of that.

1           In fact, what has happened is Mr. Milne,

2      I think uniquely in my experience among people who

3      serve -- or are required to serve significant

4      amounts of jail time, got out of jail, got himself a

5      job, and is working at that job.  In fact, what he's

6      working for, frankly, is to pay his wife's medical

7      expenses; to pay the SEC, which he's doing; to pay

8      insurance on assets that Mrs. Milne is in the

9      process of disposing of in an orderly fashion so

10     that money can be turned over to the SEC.  And that

11     is happening even as we speak.  There has been one

12     sale of those assets, and there are two more sales

13     scheduled over the next two or three months to sell

14     those assets.  And he's got to insure those.  Those

15     assets are valuable assets; the insurance is

16     expensive.  That's what he's working for.  That's

17     what he's working for.

18           There's no high living.  There's none of

19     that.  And on top of it, Mr. Milne is working in

20     Florida.  He lives in a one-room apartment in

21     Florida.  His wife is living in Westport.  She

22     requires considerable medical assistance.  She has

23     had a number of significant medical events, and

24     there are more yet to come, including, I am told,

25     significant back surgery.  He's working to pay for

those expenses.  He's doing, in other words, what he
can do.

And I look at it a little bit differently
than the government looks at it.  The government
looks at Mr. Milne as though he has breached his
promise and that he's a bad guy.  I look at it as
Mr. Milne is, in some respects, the poster boy for
what should happen in this process; that is, he's
done his time, he is doing his community service,
and he's working.  And he's working, frankly, to pay
for his wife's medical expenses and to pay the
government.  That's what he's doing.  That's how
he's spending his time.  And I think that is
something, frankly, considering the economy -- and I
know I am saying something that is self-evident, but
there has been a significant recession in this
country.  Mr. Milne went to jail in the midst of it.
He didn't have control over these assets and they
became valueless.

That's the simple answer, your Honor.
That's not his fault, that's not the government's
fault, that happened.

And I think the fact that the SEC, with
the full data, the full amount of data that has been
disclosed to them, with full knowledge entered into

1  the interim agreement.  And he has done exactly what

2  that interim agreement requires him to do.  Exactly.

3  He has not deviated from it one bit.

4          So that's why I say, your Honor, that I

5  think Mr. McGarry paints with far too broad a brush

6  here, and I think when one drills down into what has

7  really happened here, the reality is Mr. Milne is

8  doing his best and will continue to do his best.

9          MR. McGARRY:  Your Honor, if I may,

10  Marsha Massey, here from the SEC and also an

11  attorney, I don't believe admitted in Connecticut or

12  federal court in Connecticut, but if she could

13  address the Court on the agreement.

14          THE COURT:  Yes.

15          MR. McGARRY:  Because I think you'll

16  hear from her that the SEC did not have complete

17  information when they entered into just the

18  willingness to accept whatever he would give them.

19  But I'll have her address the Court, if I may, your

20  Honor.

21          MS. MASSEY:  Good morning, your Honor.

22          THE COURT:  Good morning.

23          MS. MASSEY:  The agreement regarding the

24  25 percent that Mr. Milne would pay from his income

25  that he was earning was reached actually in January

of 2013, and it was based on an incomplete financial

picture at that time.  I did not have all of the

financial disclosures with regard to the

expenditures of Tara Milne, and I had a partial

picture of what Mr. Milne was earning and spending

his money on.  That is why it was an interim

agreement.

             As the Court is aware, and I know your

Honor has had many securities cases on the civil

side, civil contempt is a remedy that the SEC has

available to it when a debtor has not paid their

disgorgement but is yet living a high lifestyle, and

the Court is entitled to take all of that into

consideration in making a decision as to what that

defendant should pay.

             Since the agreement was reached in

January of 2013, we have sent subpoenas for bank

records.  We've done an analysis on what the money

is being spent on.  Quite frankly, it's offensive.

We have a defendant who's driving a 2013 Mercedes.

He's spending money at Hermes, sending his wife

flowers every week.  One week he spent $125 at

Starbucks.  I don't know how much coffee that is,

but, my gosh, that should be a lot.  The amount of

money being spent by Mr. Milne is just offensive to

me as a public servant, quite frankly.

I've had that discussion with Mr. -- with Mr. Ginsberg, and I've talked to him about how Mr. Milne has to dial his lifestyle back so he can pay more to the SEC. That has always been the SEC's point. That's why we reached an interim agreement in the beginning, so that we can revisit this issue. It is long past the time to revisit this issue. And in fact Mr. Milne, based on our analysis, even since the last court hearing, has paid almost $150,000 to his wife, but yet only $25,000 to the SEC.

His wife was able to retain their residence, which she sold for reportedly over $4 million. And that's what she had to live on. Why he is spending a considerable amount of money now on his wife is unclear, but it appears that her lifestyle is also as out of whack with the general American public as his is.

So at this point in time the SEC is not happy with 25 percent of his income. That was an interim agreement, it was reached before we had all of the information, and now that we do, we think it's time for a hard look at what Mr. Milne is spending his money on and where it should be paid since he does have this judgment to the SEC and

1    we're supposed to be trying to make distributions to

2    the injured investors, as this Court is aware,

3    because the United Rentals case was also before your

4    Honor, and that distribution is ongoing, but these

5    are monies that should be going to the investors.

6              MR. McGARRY:  And, your Honor, by way of

7    example, even taking from the documents that Mr.

8    Pickerstein and Mr. Smart provided us, as well as

9    the SEC, since the last hearing there have been, you

10   know, $683 at liquor stores, $800 at restaurants,

11   retail purchases of $3,500, $149,000 paid to Tara

12   Milne.  In some of the documents that they've

13   provided us, car services, First Class Limo $2,250

14   in monthly cash flow.

15              The monthly cash flow, home aide, home

16   cleaning, $5,833 per month.  I read the car

17   services.  Cable satellite DirecTV, $214 a month;

18   cable satellite Cablevision, $249 a month; electric,

19   $850 a month; electric Miami $140 a month.  You

20   know, heating oil, $1,200 per month.  Gas, security,

21   telephone, $200 a month.  Utilities $3,800 a month.

22              Your Honor, when you owe $5 million to

23   the SEC, you move into a smaller home.  Your Honor,

24   $1,500 a month for a dog walker.  Your Honor, I love

25   dogs; when you owe $5 million to the SEC, you walk

your own dog.

> THE COURT:  I agree with that, Mr. McGarry.

> MR. PICKERSTEIN:  Of course the only issue is, your Honor, Mrs. Milne cannot walk her own dog.

> THE COURT:  How about Mr. Milne?

> MR. PICKERSTEIN:  Mr. Milne is working in Florida to make the money to pay the SEC, to insure the assets which are being sold to pay the SEC.  I mean, $100 from Starbucks, I think this is not what this hearing is all about.  We too have a chart.  We too have pie charts.  We too have drilled down into this.

> But, you know, what I am appalled by, as I sit here this morning, is Ms. Massey comes and says they entered into the interim agreement in February of 2013.  They did subpoenas.  They found out.  They thought his lifestyle was too high.  Not once have I heard from the SEC that we want to renegotiate the interim agreement.  Not once.  Mr. Ginsberg is here, who has been dealing with the SEC on Mr. Milne's behalf, and he hasn't heard once, until this morning.  All they had to do -- I know it's difficult for somebody -- pick up the phone and

say, guys, this agreement is -- we don't like it, we

want to renegotiate it, and we would have been then,

and would be now, happy to renegotiate.

What has happened, however, in the

interim, as Mr. Milne has significantly -- I can't

speak for Mrs. Milne.  I don't represent Mrs. Milne.

She's separately represented.  She's not directly a

party to this proceeding.  He has dialed back his

lifestyle dramatically.  He has dialed back his

monthly expenditures dramatically.  They don't talk

about that, but he has done that.  And I would be

more than happy to share with your Honor our -- I

call it grand lar (ph).  I don't know what that

means.  We have also an analysis that we would be

happy to have marked and hand up to your Honor.

But, your Honor, that has happened.  Mr. Milne has,

for whatever reason -- I don't take credit for it,

but for whatever reason has dialed back his

lifestyle.

When I said earlier, your Honor -- I

mean, Mr. Zampano, by the way, has been given copies

of these charts.  He's dialed it back.  He's dialed

it back.  The man had -- does the man have a sick

wife?  Yes.  Does she have to go to New York to see

her physicians?  Yes.  Mr. Milne told me, frankly,

your Honor, when we were meeting in my office last
night, he said, "You know what my wife eats every
night?" He says she sits down and eats a can of
tuna fish. That's not high living, your Honor.

Now, if the SEC is unhappy with the
agreement that they made -- and I do not hear, by
the way, anyone, Mr. McGarry or Ms. Massey, saying
that any of the disclosures that they have asked
for, that they have compelled, that they are in any
way misleading or inaccurate or are untruthful. If
they want to renegotiate the interim agreement that
they entered into, we're happy to do that. And I
don't know how much flexibility there is. We're
happy to do that. But they never said that until
this morning.

MR. McGARRY: Judge, the agreement that
we entered into was that he would pay $6.25 million,
giving back the ill-gotten gains within three years.
Three years has come and gone. We're not interested
in renegotiating plea agreements. When somebody has
a plea agreement and represents to this Court they
have $10 million in assets, to then come back and
say, I lost it, I can't find it, I don't know where
it is --

MR. PICKERSTEIN: That's not what I

said, your Honor.  That's a complete

mischaracterization.

            MR. McGARRY:  Maybe that's hyperbolic.

            MR. PICKERSTEIN:  That is more than

hyperbolic, it's inaccurate.  I didn't say he lost

it.  I said the value of those assets went from $10

million to zero.  I didn't say that he lost it.  I

don't know what Mr. McGarry is talking about.  Look,

the man doesn't have the money.

            MR. McGARRY:  Which means he lost it,

your Honor.  He had 10 million.

            MR. PICKERSTEIN:  I wonder if I might

have the courtesy of finishing, Mr. McGarry.

            He doesn't have the money.  The SEC

recognized that in February.  They've not done their

own discovery.  If they want to renegotiate the

agreement, we're happy to do it.  Mr. Ginsberg has

been dealing with the SEC, and I think Mr. Ginsberg

can add some value to this argument.  I don't know

if he's admitted in this court, but I'd ask your

Honor for this purpose that he be allowed to address

the Court.

            THE COURT:  You said something about

somebody eating tuna fish every night.  Groceries

here on the chart that I have below is $9,19 --

9,196.72, and then again $9,213.94.  That's an awful
lot of tuna fish.

          MR. PICKERSTEIN:  Your Honor, first of
all, there are two households being maintained.  If
you look at our analysis, based on our May
submission, his grocery bill is $250 a month.

          MR. McGARRY:  That's still a lot of tuna
fish, your Honor.

          THE COURT:  Not tuna fish every night,
that's for sure.

          MR. PICKERSTEIN:  Maybe it's something
else every night, your Honor.

          THE COURT:  Maybe caviar.

          MR. PICKERSTEIN:  I don't think it's
caviar at that price.  The point is he has dialed it
back significantly and will continue to do that.

          I'm astounded when I hear the government
saying -- the SEC saying, well, we're not happy with
the agreement.  This is the first we've had notice
of that.  That's why I want Mr. Ginsberg, if the
Court please --

          THE COURT:  Sure.

          MR. GINSBERG:  Thank you, your Honor.  I
think what may be significant for the Court to know
is that I was not the attorney representing Mr.

Milne in the early stages of this case. And, in
fact, I was retained to come in after the interim
agreement took place. And as Ms. Massey has
indicated, we had numerous conversations on the
telephone. We had numerous exchanges of e-mail. My
role, as I saw it, since this agreement was in
place, was to talk to Mr. Milne and his wife, which
I did, with her counsel present, and expressed to
them what needed to be done here, because what I
perceived the SEC was saying, and as expressed here
today, was unhappiness with the lifestyle versus the
amount of payments.

And I think, frankly, not to throw prior
counsel under the bus, but there was some concern I
think on the government's part, or at least Ms.
Massey's part, and then my client's part, that prior
counsel was being viewed as playing a little
potentially fast and loose and didn't provide all
the documents.

Ms. Massey has asked us over the last
four, five months for the documentation as to all of
these assets that are being sort of bandied around,
$10 million in assets. They were -- most of those
assets were, at the time Mr. Milne went to jail,
essentially ill-liquid. They were in these

partnerships that didn't have a real value in terms
of trading on the market or selling, it was a
potential for an investment to grow into something
else.

During the time he was in jail, largely
because of the recession, they lost their value; not
because he did anything, not because he took his
money out and spent it, not because of any direct
conduct he had the ability to utilize while he was
in jail with the businesses.  Other people were
running the businesses.  By the time he came out,
there was very little value left.

The government asked me, on behalf of
Mr. Milne, to provide all the documentation we could
as to each one of those partnerships, what the
initial investment was, how those partnerships had
progressed over time, why there was no value left in
them.  And not only did we do it, we did it multiple
times.  In fact, most recently we spent hours and
hours and hours over two days pulling everything
together.  What we submitted, because of the
electronic age, on our side it was fine, but on the
government's side they weren't able, with all the
technology, to open the documents.  We did it again,
we put it on a disk, we sent it to them.

1          The point I'm trying to make, your Honor,

2   is my job was to bring this into compliance as best

3   we could given Mr. Milne's financial situation.  I

4   don't think Ms. Massey will dispute that I've done

5   everything that was asked of us.  Whether or not the

6   lifestyle of the millions is displeasing to the

7   government or possibly to the Court is a separate

8   issue.  If we have to deal with that and address it

9   moving forward, as said by Mr. Pickerstein, we will.

10  We have dramatically changed the way we are dealing

11  with the case.  I look at the terms -- and I saw

12  what was provided and what may not have been

13  provided, and I felt both as Mr. Milne's lawyer and,

14  frankly, as an officer of the court, with a

15  reputation, at least in my district, a reputation

16  dealing with the U.S. Attorney's Office and the SEC,

17  to make sure everything that they needed to know was

18  provided to them to make their assessment, and we've

19  done that.

20          And we've made all of these payments.

21  We were even as careful -- recently he received a

22  commission, not for the job that he has but for

23  something that he did previously that finally came

24  into fruition, and I was reluctant to have him make

25  the exact payment until I was able to coordinate the

formula that I believed was in place with the

formula that had been agreed to with the SEC.  So we

held off and we went through it, and we made the

payments today, frankly, which I wasn't even sure

was the exact amount, but we felt we should go ahead

and do it at this point.

So I think that -- the government, I

know, is urging the Court to take a hard look at it,

and we are really, frankly, not afraid of the Court

taking a hard look at it, and you'll make obviously

your judgment as to what has now taken place over a

period of time.  But the Court, I hope, should

understand that all of us on this side at this table

have done everything we could to force the lifestyle

down slower and slower.  And it may still look a

little glamorous to people.  I understand that.  I

live in New York City.  I know what Starbucks costs

in New York City and taxi cabs and, you know, dog

walkers.  I understand.  And I've talked to Mr.

Milne and Ms. Milne, with her lawyer, about some of

that.  But we are making every effort, and we're

continuing to do it, and he will be able to pay this

obligation off.

Frankly, his hope is -- since he's only

been in this current job for around a year or so,

his hope is that his salary will increase, bonuses

that he may get -- and he's gotten some already --

will increase.  The payments will increase and he

will be able to do what was read by the government

he said to the Court he wants to do, because he

doesn't like living like this either, with this

hanging over his head.  He wants to make the

payment, continue working and move on.

So I apologize if I was a little wordy,

but I'm going to have this as my only opportunity to

tell everybody else to continue on.  And I was

trying to be a little more civil.  I see the tone

got a little heated up.  I don't accuse anybody of

it.  Ms. Massey and I have been on very cordial

tones, and I want to keep it that way.  So, your

Honor, at the end of this case when the payments

have to be made and the agreements that could be

made -- we have been communicating back and forth,

and I've been available for anything that the

government, the SEC needed.

Thank you for the opportunity.

THE COURT:  Thank you.

MS MASSEY:  Your Honor, may I respond?

THE COURT:  Yes, ma'am.

MS. MASSEY:  I do not disagree with much

of what Mr. Ginsberg said.  We have had a good

relationship and he has been forthcoming with

information that I've asked for them to provide.

I think part of my frustration is that

this 25 percent agreement keeps manifesting itself

as some official agreement.  I had mentioned that he

should pay at least 25 percent of his earnings as a

voluntary garnishment, but that was going to be

subject to being revisited.

I think it's probably a matter of

semantics that I said the agreement is now null and

void.  Instead, I spoke to Mr. Ginsberg, we need

substantial payments.  We need more money.  We need

substantial payments made by Mr. Milne.

Mr. Ginsberg understands that.  I've

talked to him about contempt and the contempt case

law that's available to the SEC if we needed to go

the civil route, which looks at the defendant's

ability to pay, no cap on the percentage of income

that we can recover, it's what the court decides in

equity is appropriate.

So I have never dealt with Mr.

Pickerstein, and that is true, my dealings have

always been with Mr. Ginsberg, and I think Mr.

Ginsberg understands my frustration with the

1   information I've seen.  I believe I've adequately

2   described that for him.  At this point in time, your

3   Honor, for example, the $83,000 payment that Mr.

4   Milne received, I think if he were serious about

5   paying off his debt, he would pay the entire $83,000

6   that's a windfall, but yet they're playing a game of

7   giving us just the 25 percent.

8            The frustration here is, your Honor, the

9   judgment was entered by this Court.  It's not up to

10  the SEC to beg them to pay it.  It's his obligation

11  to pay, and that message is just obviously not

12  getting through.

13           MR. McGARRY:  Your Honor, if I may, I

14  believe it's nice to have civil -- civil --

15  attorneys here in our courtroom, but we are here on

16  a violation of supervised release.

17           MR. GINSBERG:  Just so your Honor knows,

18  my primary practice is SEC and criminal defense law

19  in the Southern and Eastern District.  So I'm well

20  aware of what a violation of supervised release is

21  and all the things that surround it.

22           MR. McGARRY:  So then Mr. Ginsberg and

23  the Court are familiar with 7B1.3, revocation of

24  probation or supervised release, Section (a)(2),

25  upon the finding of a Grade C violation, the court

1    may revoke probation or supervised release, or

2    extend the term of probation or supervised release

3    and/or modify the conditions of supervision.

4           I think we're all agreed, regardless of

5    the gloss that one would put on it, that there's a

6    violation here.  I think we can all agree since

7    March, we were here, Mr. Milne has done some, but

8    the records don't seem to reflect him doing his

9    level best to get back in compliance.

10          So I try to analogize the white-collar

11   criminals to all the other defendants that come

12   before your court, and when people, you know, face,

13   you know, Mr. Zampano or Mr. Norton or any other of

14   the fine probation officers and they're told they're

15   in violation, they have to scramble pretty quick to

16   convince the court that they're doing their level

17   best to get back in compliance.  And I don't see

18   that here.  I see him saying he wants to, that he's

19   going to, but I still -- I don't understand, and

20   maybe I never will understand, how you can drive a

21   brand new Mercedes when you've promised to pay $5

22   million.  How you can even -- when we have a bill in

23   our house that's late, we scramble and we work and

24   we pay it.  So I don't understand how one can just

25   live the lifestyle.  But it's not me, it's his

1    issue.

2          But I suggest to the Court that as a

3    lawyer and as a businessman, he's not doing his

4    level best to comply with the promise he made.  He's

5    in violation, and the guideline range for a Grade C

6    violation is 3 to 9 months in prison.  That's -- and

7    I question, and I propose the rhetorical question to

8    the Court:  Has there been something demonstrated

9    for a downward departure from that range?  Have you

10   seen something that says, well, you know, I got this

11   single mom who's not making her $50 a month

12   restitution payments, but she can't do it, so I'm

13   going to give her another chance.

14          Or I see this person who claims he's an

15   addict, and even though he's had two or three dirty

16   urines, I'm not going to revoke him, I'm going to

17   give him Support Court.  I hope they raised money

18   throwing horseshoes yesterday for Support Court so

19   people can get back on the right track.

20          Or is this the kind of thing where

21   someone's not getting the message, that they were in

22   front of you in March, that they told you when they

23   were at their sentencing they were going to do

24   everything they could when they wake up every day,

25   and they haven't, they really haven't changed since

1   March, and that a period of incarceration is

2   appropriate.

3           I suggest that it is, your Honor.  I

4   suggest that a term somewhere in the guideline range

5   would be appropriate.  I know we're going to hear

6   then the fine will not get paid, but I'm going to

7   leave that to Ms. Massey and the SEC and whatever

8   the house money is or whatever, because when I see

9   someone violating the conditions of supervised

10  release, I think, is there a ground for downward

11  departure?  If not, the guidelines are a good

12  starting point to consider whether or not a couple

13  months in prison, whether it's three, six, nine,

14  will let someone know that when you stand before a

15  federal judge and you make a promise, that you have

16  to keep that promise.

17          And I can tell you that I might have

18  some suggestions if the Court were to go under

19  7B1.3(a)(2)(B), to extend the term and modify the

20  conditions, but I don't know if that would be

21  appropriate because I would think that since March

22  we would have seen a change, and we haven't.  So I

23  don't think another warning, if you will, is going

24  to get the message through.  And I think just like

25  all the other defendants that come through here,

1  when they violate their conditions of supervised

2  release, I think it was Judge Clarie (Ph) who said,

3  give them a taste, that there should be a period of

4  incarceration.  And I realize that I might be

5  arguing against my colleague, Ms. Massey, whose job

6  it is to try to recover as much money for the

7  victims, but I think in the big picture when a

8  white-collar defendant violates the conditions of

9  supervised release, just like any other defendant,

10 the Court has incarceration as a tool, and I think

11 in this case it should use it.

12          THE COURT:  Thank you.

13          MR. PICKERSTEIN:  Your Honor, I think

14 under these circumstances even to suggest

15 incarceration is off the charts, and I have several

16 reasons for that.  Number one is I go back to the

17 agreement under which Mr. Milne was making the

18 payments.  He complied with that agreement.  All

19 somebody had to say was, hey, we have to renegotiate

20 the agreement.  We're here, we're ready to do that.

21          Number two, I don't really care about Mr.

22 McGarry, how he handles his household.  I really

23 care how Mr. Milne is handling his household, and

24 his expenses have decreased dramatically since --

25 I'm not going to claim credit, but since --

1    certainly since the March hearing those have gone

2    down.  Those have been knocked down dramatically.

3         If you lock him up, there is a chain of

4    events that will occur that is in nobody's interest.

5    Nobody's interest.  Number one, he will lose his

6    job.  That's going to be gone.  He has an at-will

7    contract.  That's where this money -- he's living

8    off of his paycheck.  There's nothing else there.

9    That's where the money to pay the SEC, to pay the

10   victims is coming from.

11        Not only will he lose his job, your

12   Honor, but it is highly likely, in my opinion highly

13   likely, that he will be removed from the United

14   States.  Mr. Milne has a green card.  He is not a

15   United States citizen.  We had that issue before,

16   your Honor, that resulted, frankly, in Mr. Milne

17   doing harder time than he might otherwise have to

18   do.  That was dealt with, but I am highly confident

19   that if you incarcerate him at this point he will be

20   removed from the United States and that's that.

21   That's that.

22        The third is, your Honor, I think it is

23   appropriate under these circumstances to look at

24   Mrs. Milne for whose care, for whose treatment and

25   for whose well-being Mr. Milne is deeply concerned

and has made payments to.  Again, he's paying for
health care.  He's paying for health care aides.  By
reason of quirks that are far beyond my pay grade,
most of her medical expenses are uninsured, are
uninsured because they were considered preexisting
conditions.  So that's coming out of pocket.  And
that's a lot of money.  That's a lot of money.  And
there's going to be more money.  Mr. Milne told me
that she requires a back surgery, a very dangerous
back surgery by the way, and he has no idea how he's
going to pay for it.  He's no idea how he's going to
pay for it.

So I think the point has come home to Mr.
Milne.  To the extent what was before was before, I
can't answer for that, your Honor.  I mean, I've
been involved in this case, but really only
peripherally with the negotiation.  I was not
involved with that.  But since, you know, since
we've been involved, since the hearing before your
Honor, there has been a lifestyle change.  There has
been a dramatic change.

We are more than happy -- we are more
than happy to discuss with Ms. Massey or whomever
else a revisiting of the interim agreement.  We this
morning -- this morning Mr. Milne wrote a check in

1    the clerk's office for 17,000-odd dollars which he

2    felt he was obligated under the agreement to make.

3         Now, I suppose it's true, as Mr. McGarry

4    suggests, that he really should have paid more, but

5    he has dramatically high expenses.  In an ideal

6    circumstance Mr. Milne -- the lease on his house

7    expires, Mr. Milne would like to -- would insist on

8    downsizing from Ms. Milne, and that is certainly in

9    the future.

10        But what Mr. Milne is living with right

11   now, his contract, his employment contract, is an

12   at-will contract which could be terminated at any

13   time.  While there is a severance payment under that

14   contract, much of that severance has been advanced

15   to Mr. Milne, frankly, to allow him to make these

16   payments, and that's going to go by the wayside.

17   Everything's going to blow up.  Everything's going

18   to blow up if that happens, and I just don't think

19   it's appropriate under these circumstances.

20        Again, I know the sensitive issues are

21   the expenses.  I'm a big boy.  I've been around this

22   court even more than Mr. McGarry's been around this

23   court.  I am representing that we have worked on

24   that.  We have made our very best effort to convince

25   Mrs. Milne that they need to go down.  Again, I

don't represent her and I can't make representations

on her behalf.  I just can't do that, your Honor.

That's not within my authority.

But Mr. Milne is certainly aware of that.

I think this is a time when the message has been

received.  I think it's a time to allow Mr. Milne to

continue to work with the SEC.  It's not as though

he's walked away from this, your Honor, as we see

many, many times.  He didn't get out of jail and

walk away from the obligation.  He's doing

everything he can to meet the obligation, and if all

goes reasonably well, he will be able to meet the

obligation.  He's not told them -- he's not left the

company.  He hasn't scammed.  He hasn't concealed

anything.

From February to May -- I think from

February to May -- we worked diligently to put

together all of the documentation that the

government -- the "government" I mean both the SEC

indirectly and the United States Attorney's Office

-- requested.  We produced I think five volumes of

documents so they could look at everything.

They say -- they make light of the fact

that I said these investments were lost.  Mr.

McGarry makes a bit of a joke about that.  We gave

them all the offering memos.  We gave them all of
the documents.  We had our own people look at it,
and there is no value in those.  When I say lost, I
don't mean that he dropped a dollar bill out of his
pocket on Church Street.  I mean the value was gone.
It's not there.  So to keep saying, we want our
money, we want our money, we want our money, is the
loan sharks.  That is the loan shark's response.
But the fact is, he doesn't have it.  So the promise
that he made to your Honor was a valid promise and
he fully believed that those interests could be
liquidated and paid to the SEC.  That didn't happen,
not because he did anything, but because the economy
turned on him.  You know, that's what happened.  The
toothpaste's out of that tube.  That's what it is.

So if you're incarcerated -- considering
incarcerating him, he can't correct it, he can't
make it better.  He's gotten the message.  But
jailing him is not the answer.  Jailing him is
simply not the answer under these circumstances,
your Honor.

I ask for your Honor's mercy.  I ask for
your Honor's consideration.  More importantly, I ask
for your Honor to look at the entire picture and to
see what has happened and what we hope is going to

1   happen as Mr. Milne continues working as he is and

2   continues to try to make money.

3          I mean, I don't think I've ever

4   represented a client -- I don't think I have -- who

5   within three months of getting -- six months of

6   getting out of jail was able to land a job that is

7   paying him the kind of money Mr. Milne is making.  I

8   don't think I've ever seen that.  And I don't think

9   I've ever seen a client who has taken significant

10  shares of that money and paid it to the government.

11  A client has said to me, "How can I avoid it?  What

12  can I do?"  I've heard a lot of things, but never

13  from Mr. Milne.  He has always recognized the

14  obligation.  He recognizes it now, and he will

15  continue to recognize it.

16         Thank you, your Honor.

17         I do have one request, however, if I may.

18  And I'm not sure this is the appropriate time, but

19  I'm going to make it anyway.  I said to your Honor

20  that Mr. Milne is concerned about his continued

21  employment, for obvious reasons.  One of the issues

22  with respect to that continuing employment is that

23  Mr. Milne is unable, other than traveling to

24  Connecticut and New York and to Florida for

25  business, that's what he does -- he doesn't own a

car in Florida.  He told me this morning he rides to
work on his bike.  God bless him.  But the point is,
your Honor, if you were able -- if he were able to
travel more freely for his job within the
continental United States, I think that would not
only assure his continued employment, but it would
be in everybody's interest.  Therefore, I would
request that as part of this your Honor consider
granting him permission to travel throughout the
United States on notice to Mr. Zampano.  He has done
that.

        THE COURT:  What is the nature of his
employment?

        MR. PICKERSTEIN:  He's a chief operating
officer for a dating company in Florida.

        THE COURT:  A dating company?

        MR. PICKERSTEIN:  Your Honor, it's a
lawful company.  That's what it is.  I don't make
that judgment.

        THE COURT:  Why is it necessary to
travel throughout the United States?  Find dates?

        MR. PICKERSTEIN:  No, your Honor.  He's
not doing that.  The company is -- I've had this
discussion.  I would ask Mr. Milne.  He can describe
that better, with the Court's permission.

1          Mr. Milne, can explain that to -- your

2     Honor, I would ask he be permitted.

3          THE COURT:  Okay, I would like to know

4     more.

5          THE DEFENDANT:  Thank you, your Honor.

6     The company that employs me has multiple offices.

7          THE COURT:  Do you want to come to the

8     microphone?  The young lady has to take down

9     everything you say.

10         THE DEFENDANT:  Sure.  The company I'm

11    employed by -- good morning.  Sorry.  The company

12    I'm employed by is called Global Personals.

13         THE COURT:  Global what?

14         THE DEFENDANT:  Global Personals.  And

15    as Mr. Pickerstein describes, it is in the business

16    of internet dating and social networking.  There are

17    a number of companies that are public and private in

18    this industry.  For example, there's one called

19    Badoo, Tumbler.  Plenty of fish, believe it or not.

20    A multibillion dollar company.  In any event, my

21    responsibility is -- I'm actually not the COO, I am

22    the CEO.  I'm the senior-most executive at the

23    company working directly with the shareholders.  My

24    responsibility, therefore, is for the overall

25    operation of the business as well as the future

growth.  We have multiple offices throughout the

U.S. We have locations in New York, Baltimore,

Washington, Fort Lauderdale, Miami Beach, Culver

City, San Francisco.  I've not been to any of those

other than the Florida locations.

We also are actively involved in trying

to acquire other companies who are competitors in

this industry, because our goal is to build up the

value.

What no one has mentioned, which I think

is important to mention, if you don't mind taking a

slight left turn, I have equity.  I'm entitled to

equity.  It's not true equity in the sense of a

stock, but it's structured like an equity profit

plan.  If I'm successful building this company,

which right now is about a 50, 60 million dollar

business, if I'm successful building this, which is

what my mandate is, and we're successful selling

this, there is a very significant amount of money,

in addition to my monthly payments, that would be

coming into my possession.  There's no guarantees of

that, but that's what I do.

As was explained, that's the promise I

made, and that's what I do every day, is try and

find a way to make a significant amount of money.

As you might imagine, with a $5 million obligation looming over your head, it's very frustrating to have a few thousand dollars to spend each month to try to satisfy that obligation knowing that it's going to take 13 years at that rate to satisfy it.

My real ability to satisfy this obligation is to create, for lack of a better word, real money. I've done that before. I've done that quite successfully before, and quite legitimately before. I've done two public companies. Anyone would tell you I was a substantial part -- I'm sorry -- of building those two companies. Unfortunately, after I built those two companies I ventured on my own trying to start a number of other companies that did not work out. We acquired a number of veterinary clinics. I wasn't around to run those; I was sitting in prison. We acquired a trade school in Hartford. I wasn't around to manage that, I was in the process of being -- you know, of going through this criminal investigation. We acquired a brewery in Pittsburgh. I wasn't around to run that because I was incarcerated.

I don't consider myself uniquely talented, but in my own way I do consider myself talented in what I do. And those investments, were

they hurt by the economy?  Yes.  But I think they
also were substantially harmed by the fact that I
wasn't there to run those businesses.  That was just
a fact.  As you well know, you can't pursue business
from inside prison.  Some do, but those aren't the
sort of people I want to be associated with.

So, in any event, to your point on
travel, we have offices throughout the United
States, but the other part of it is we are trying to
acquire companies.  There's two elements to that.
Number one is the acquisition of those companies,
which obviously requires me to go meet with their
management teams and their shareholders where
they're located and do due diligence on those
companies.

And the second element of that is we are
going to raise some capital as part of that
exercise.  The shareholders of my company have
decided they want to borrow some money.  They've
never -- you know, they have no leverage on the
balance sheet and they want to balance some money.
So we are meeting with potential lenders, which at
this point has begun, but I'm obviously hoping to
attend those meetings in those cities that Mr.
Zampano knows, and he was kind enough to allow me to

attend meetings in New York about three weeks ago
for that particular reason.  But we also have some
on the West Coast that would be interested pursuing
opportunity with us.

I'm not looking for personal travel.  I'm
not looking for leisure travel.  I frankly have no
intention of spending money on that in the
foreseeable future.  What I would like to do is be
able to travel within the United States, giving Mr.
Zampano more than adequate notice so that if he
objected to any of that travel, he can obviously, we
have a very good communication line open, and --
point made.  Okay, shut up.  Sorry.

MR. PICKERSTEIN:  Thank you, your Honor.

THE DEFENDANT:  Thank you.

MR. PICKERSTEIN:  I don't like to stop
clients, but I think the point is made.

Thank you, your Honor.

MR. McGARRY:  Your Honor, just briefly.
And I appreciate your patience this morning.  Just
to give the Court a little bit of a refresher, Mr.
Milne has been in the rollup business where you buy
small companies, collect them up together, make a
big company, and maybe do an IPO to sell it
publicly.  They did that.  The management team did

1    that successfully with United Waste.  Then they did

2    it with United Rentals.  And in United Rentals they

3    made their earnings look better by doing round-trip

4    transactions, sale leasebacks, selling an asset with

5    a promise to buy it back so you can book the gain

6    today, or this calendar year.  And as he stipulated,

7    from December of '02 through his termination in '05,

8    the defendant served as president/chief financial

9    officer of United Rentals.

10          In 2003 he and others agreed to, and

11    did, cause United Rentals to falsify its books and

12    records with respect to the nature of certain

13    payments made to settle obligations incurred as a

14    result of leaseback transactions.  In this regard,

15    in or about December 31st, 2002, the defendant

16    executed an agreement with Terex in which United

17    Rentals agreed to make a payment to Terex to settle

18    with one of the minor sale leasebacks.  On

19    January 3rd, 2003, the defendant caused URI to send

20    a payment of $8,771,172 to the Terex Corporation to

21    settle URI's outstanding obligations under the minor

22    sale leasebacks.

23          Jumping to the end, the defendant

24    thereafter caused others to make false entries in

25    URI's books and records with respect to the nature

1   of payments, all set forth in paragraph 20X through

2   AA.

3             So, unfortunately, part of his success in

4   making money in the IPO at United Rentals was by

5   virtue of the filings that they made with the SEC as

6   to their earnings were false.  And that's what he

7   agreed to.  That's what he pled to.  We calculated

8   his personal gain from the sale of stock when the

9   stock was inflated to be over $12 million.

10            It is there that the SEC agreed to the

11  $6.2 million where he did a rollup, sold the stock,

12  made the money, and they asked him to give it back,

13  because, as he admitted, it was false books and

14  records, false filings with the SEC in order to make

15  the company look better.

16            It does give us a little bit of pause

17  that at a violation hearing Mr. Pickerstein -- and

18  perhaps the best defense is a good offense -- tried

19  to turn it into a modifying of conditions of

20  supervised release.  And it gives us pause that Mr.

21  Milne would go out and purchase, rollup, maybe

22  misstate the value and try to do an IPO, because

23  sometimes people re-offend.  And we certainly would

24  hope that would not happen, but I don't know if this

25  is the time to modify the conditions.

1          From the filing that I got from Mr.

2     Zampano, wealthymen.com, caliente.com,

3     blackfling.com, yet to be named site known as

4     benaughtykiller, fling.com LLC, meetlocals LLC, yet

5     to be named site focused on gay men, he's apparently

6     doing a dating rollup to take the small sites, roll

7     them up perhaps into a big, you know, dating.com to

8     take on match.com or meetsingles.com, and then sell

9     it.  Again, we would be concerned to make sure

10    there's no fraud in the books and records, because

11    I'm sure the SEC doesn't want to get paid back the

12    disgorgement from the last securities fraud by

13    another securities fraud.  So that's what I would

14    say on that.

15          One other comment that I would mention is

16    I think that the Court should be aware that Mr.

17    Pickerstein said he doesn't know how he got the job,

18    but I believe one of Mr. Milne's former colleagues

19    at United Rentals helped him get this job, and that

20    was also the same individual that bought his house

21    for multimillion dollars.

22          So just trying to bring it all back

23    together, give the Court as much information, we're

24    here on the violation hearing.  I don't think we're

25    here to modify and loosen conditions.  Again, I go

back to what I said earlier, that I think the time

has come and gone to improve the efforts.  We stood

here in March and the time to downsize could have

been between now -- between then and now.  The time

not to get a new Mercedes but to get a Ford Focus

could have been, you know, between then and now.

And as a prosecutor I'm always surprised that

defendants between the time of when they do

something wrong and have to get sentenced don't make

Herculean efforts to put themselves in the best

position.  He's made some payments, but if he's

dramatically reduced his expenses, why are the

monthly payments of $6,000 only $6,000?  I know we

heard of another $17,000 payment today.  If he's

dramatically reducing his expenses, why does Marsha

Massey have to call and say, "Can you please

increase the payments?"  Why isn't it, hey, we cut

down, here's 12, here's 15, here's 32.  I sold this,

here's some more.

I just don't see that.  And I think that

in order for him to get the message, in order for

him to think that this is not a typical negotiation

where he gets to negotiate with the government,

negotiate with the SEC, negotiate with the Court,

and like a typical negotiation, if you don't like

where the negotiating is going, add another term and
start asking for more release so maybe you end up
back where you were in the first place.

This is not a negotiation.  This is a
sentencing on a violation hearing, and I go back to
the guideline book.  And, again, the Court need not
be beholden to the guideline range, but I haven't
seen a great reason to depart.  I haven't seen a
good reason to depart.  And if that book Mr. Zampano
has in his office is good for every other defendant
who violates the conditions of supervised release,
and if people get sent back for not making
restitution or missing meetings or having dirty
urines or otherwise violating or not keeping curfew,
I think we have a repeated pattern here of not
paying, not making his level best, and I just go
back and urge the Court to consider a guideline
sentence in connection with the violation.

MR. PICKERSTEIN:  I'm going to be very
brief, your Honor, because if I say what I'm
thinking, I'm going to get in trouble.

Number one, what Mr. McGarry does not
mention to your Honor is that today United Rentals
remains a going concern of great shareholder value.
That's point number one.

Point number two is that Mr. Milne
throughout believed that he had an agreement with
the SEC and he believed that he was complying with
that agreement to the best of his effort.

Number three, I've heard a lot about
groceries, I've heard a lot about a Mercedes Benz --
which, by the way, is a leased car, it is not a
bought car.  The fact of the matter is, your Honor,
he is trying.  And as he stood before your Honor and
explained how he's going to try, if there's anyone
who thinks that the law enforcement authorities of
this country, including the Securities and Exchange
Commission, is not going to be looking with a
magnifying glass at any investments in which Mr.
Milne is involved, then they are making a very, very
big mistake.  And Mr. Milne recognizes that now.

Your Honor, he made a mistake.  He's
paying the price for that mistake.  He is in the
process of redeeming himself and I think he should
be allowed to continue to do that.

As I said earlier, this is not a
negotiation from us.  We're not asking that that
amount be reduced.  We're just asking that he be
given the opportunity to pay it.  That's all we're
asking for, that he be given the opportunity to pay

1  it, and that's what he's trying to do.

2          THE COURT:  Isn't he here because he

3  hasn't been paying it?

4          MR. PICKERSTEIN:  Your Honor, he admits

5  that when he got out of jail he owed the

6  $5.2 million.  He didn't pay it because he didn't

7  have it.  That's why he's here.  By the way, I

8  should mention, I think this is appropriate because

9  I think this is a case of redemption, but every time

10  that Mr. Milne is back in Connecticut from Florida

11  to see his wife, he is also putting in hours, hours

12  to satisfy his community service obligation, which

13  is -- that's documented.  I believe Mr. Zampano has

14  the documentation.  So he's not blowing everybody

15  off.  He's doing to the best of his ability what he

16  can do, and that's why I ask for your Honor's

17  consideration.

18          THE COURT:  I think one of our primary

19  concerns is repayment of his debt, and if I'm not

20  altogether clear about his ability or interest in

21  making those payments to the SEC that I should leave

22  him at liberty.  Do you understand?

23          MR. PICKERSTEIN:  I couldn't hear your

24  Honor.  I apologize.

25          THE COURT:  I'm sorry.  I said my

1   prominent concern is to see to it that the SEC

2   receives the payments that it is due, and I'm not at

3   all confident that your client's prepared to do

4   that.

5           MR. PICKERSTEIN:  He's absolutely

6   prepared to do that, your Honor.  He's absolutely

7   prepared to do that.  Other than, you know,

8   basically reduced -- living on the street, he's

9   prepared to do that.  If they want -- if the monthly

10  payment, the 6,000 that he agreed and which Mr.

11  Milne agreed -- they had an agreement -- if it needs

12  to be increased, we're happy to discuss that.  It's

13  6,000 and change, your Honor.

14          THE COURT:  Okay.

15          MR. PICKERSTEIN:  But those have been

16  made regularly.  Regularly.  And the bonus, the

17  bonuses have been accruing sort of payments.  So

18  it's not just money in his direct pocket.  That's

19  why, your Honor, when we stood before you and said

20  he's trying to grow this business -- because he does

21  have an equity interest.  And Mr. McGarry used a

22  term I'm not familiar with, but to the extent it

23  grows and is sold, that's where the bulk of the

24  money's going to come from, if that happens.  But

25  he's not walking away from his obligation in any

1  way, shape, or form, your Honor.

2          THE COURT:  He made a payment this

3  morning?

4          MR. PICKERSTEIN:  He made a payment,

5  yes, your Honor, this morning.  He made a payment of

6  -- I actually have the receipt -- $17,745.

7          THE COURT:  My very helpful lawyer has

8  suggested to me that payments have been made in the

9  amount of some $250,000.  Is that right?  Since late

10 May?

11         MR. McGARRY:  Your Honor, I believe

12 that's correct.  The majority of that is based on

13 the sale of some of the assets that the SEC had an

14 interest in.  I believe it was part of the judgment

15 and decree, if that's the right civil word, that

16 they had a lien on or interest in property.

17         THE COURT:  I see.

18         MR. McGARRY:  That was sold.  And I

19 believe the recent $17,000 represents approximately

20 25 percent of a recent $83,000 bonus that the SEC

21 recently found out about through, I guess, their

22 subpoenas and due diligence.  So, again, we have an

23 $83,000 payment --

24         MR. PICKERSTEIN:  It's not a bonus, your

25 Honor.  It was a consulting fee that Mr. Milne

1   earned that he just received payment on.

2           MR. McGARRY:  So out of the realm of his

3   salary, he received an extra $83,000 consulting fee

4   and, again, gave 25 percent.  That's where the 17

5   figure comes from.

6           THE COURT:  Well, it seems to me what I

7   should have the greatest interest in is seeing that

8   payments are being made regularly to the SEC, and

9   incarcerating the defendant isn't going to assist in

10  that regard.  So if we can be confident that

11  payments will now be made regularly as required, I'm

12  willing to continue this matter to see whether or

13  not that happens for a couple of months, and then

14  you can bring us up-to-date on what Mr. Milne is

15  doing to meet his obligations.

16          MR. PICKERSTEIN:  I'm certainly happy to

17  agree to that, your Honor.  I would ask that --

18  there's sort of a trigger date.  There's a

19  November 1st, 2013, trigger date under his contract

20  where things may or may not happen.  So I would ask

21  that we just put it past that point.

22          THE COURT:  Past November 1st?

23          MR. PICKERSTEIN:  Yes, your Honor.  I

24  just don't know.  It's possible that I could stand

25  before your Honor -- I think it's highly unlikely --

1  and I say he's lost his job, and I just want to --

2          THE COURT:  Presumably he would lose his

3  job if I sent him to jail.

4          MR. PICKERSTEIN:  Absolutely.

5          THE COURT:  That's not in anybody's best

6  interest then.  What I am interested in is seeing

7  him meet his obligations of his debt to the SEC.

8          MR. PICKERSTEIN:  I understand that,

9  your Honor.

10          THE COURT:  I am trying to determine

11  what is the appropriate way to get that

12  accomplished.

13          MR. PICKERSTEIN:  I would just ask, your

14  Honor, that that be November 1st -- that we can come

15  back after November 1st, and I can say, your Honor,

16  they're going to continue the employment, everything

17  is good, and we can increase the --

18          MR. McGARRY:  Your Honor, if I may make

19  a suggestion.  According to the document prepared by

20  the SEC, which we handed up, if you look at the page

21  6 of 6, and I think you have a color version,

22  there's a pie chart.

23          THE COURT:  Yes.

24          MR. McGARRY:  It appears on this

25  document, from my conversations with SEC, that since

1   July of 2012 to July 2013, and realizing we're now

2   in September, that approximately over $400,000 went

3   to Tara Milne's Fidelity account and another 50 or

4   so thousand dollars went to third-party payments.  I

5   would suggest that you set payments as required.  I

6   think the government would like to see a $500,000

7   payment between now and November 1st, or

8   November 15th, because the money seems to be there.

9           THE COURT:  You think it is?

10          MR. McGARRY:  It seems to be in Ms.

11  Milne's Fidelity account, and if she also got

12  proceeds from the sale of the home, that there needs

13  to be some sincere effort made to put a big dent

14  into this obligation that, as I've said, is already

15  past due.

16          MR. PICKERSTEIN:  The money's not there,

17  your Honor.  We provided the SEC with complete

18  records -- all those account records.  The money is

19  not there.  He doesn't have $500,000.

20          To the extent --

21          MR. McGARRY:  $400,000 payments to Tara

22  Milne's account between July '12 and July '13 from

23  Mr. Milne's TD Bank account.  For Mr. Pickerstein to

24  say he doesn't have it may be too clever because we

25  keep hearing about her expenses, but we're exempting

money that he put into her Fidelity account.  He

can't have it both ways.  You can't pay for the

expenses and give money over here and then say I

don't have the money because she has it, that's her

money, but also I have to cover her expenses.

So I would suggest a payment of

approximately $500,000 be made to the SEC to show

that he's trying to comply.  And I don't think that

that is too much to ask.  When we look at the list

of assets that's been provided to Mr. Zampano, that

has Picassos and diamonds and diamond studded

earrings and Matisses.

THE COURT:  Those are being sold?

MR. PICKERSTEIN:  The SEC has a security

interest in all of those, your Honor.  Those are

being sold in an orderly fashion through a reputable

auction house, Bonhams, in New York.  They have had

one sale so far.  As I said earlier, there are two

additional sales that are scheduled, and those

proceeds are being remitted to the SEC.

MR. McGARRY:  Let's schedule them before

November 1st.

MR. PICKERSTEIN:  I can't schedule them,

Mr. McGarry.  I'm not Mrs. Milne's lawyer.  What are

you talking about?

1              MR. McGARRY:  Then there's another

2    $400,000 in this Fidelity account that the SEC has

3    tracked from Mr. Milne's TD Bank account into her

4    Fidelity account.  It's page 6 of the exhibit we

5    handed up.  And, again, it boggles the mind that

6    they see that money and Mr. Pickerstein says the

7    money's not there.

8              MR. PICKERSTEIN:  If they want to take

9    all of the items in which they've got a security

10   interest -- that is the SEC -- they can just take

11   them.  If they think they can do a better job than

12   Ms. Milne and her lawyers, God bless them.  That's

13   not being withheld.  That's -- the schedule has been

14   disclosed.

15             MR. GINSBERG:  I can discuss the timing

16   issue, your Honor.  I have been in touch with Ms.

17   Milne's lawyers.  The auction houses did not want to

18   do any sales over the summertime because during the

19   summertime they don't get a big enough audience of

20   people to buy those kinds of items.  So they

21   scheduled sales for October and November because

22   that's when they believe there's the most chance

23   that they can raise the most money.  The original

24   sale was a bit disappointing in terms of what they

25   received from what they had priced the items at and

1    they thought that they would be careful about when

2    they do the sales.  It's not to delay anything.  The

3    advice that's being used and -- the advice from the

4    auction houses to the lawyers -- the lawyers don't

5    know when to do these things.  It's not being done

6    willy-nilly, it's being done for a specific reason

7    or purpose, and that is to get as much money as

8    possible from the sale which would be turned over

9    directly to the SEC.

10            THE COURT:  And apparently it's

11   scheduled for sometime in November?

12            MR. GINSBERG:  There are two of them.  I

13   believe one is scheduled late October, early

14   November, and one in November.  There are two more.

15   And then based on what happens at those sales, I

16   think there's another set of items that will be

17   sold, but they're waiting to see what happens with

18   the next set.  In fact, I think they switched

19   auction houses because the lawyers were disappointed

20   with the way Bonhams had dealt with the first set,

21   so they went to Sotheby's and Christie's, which may

22   be a little better known by most people.  They're

23   doing their best to get the best value out of them.

24            MS. MASSEY:  Your Honor, I'm afraid that

25   we've somewhat conflated some issues and that maybe

taking a step back would be helpful.

We have a security interest in what was represented to the SEC to be approximately $6 million worth of assets that were owned by Tara Milne. In addition, Tara Milne had a residence that was valued at a minimum of 4 to 6 million dollars and other assets. We did not take any action against those. We just had a security interest in $6 million, and that was enumerated and the Court has that attachment of those assets as part of the judgment.

They are trying to sell those assets. Mr. Ginsberg is right, the sales have been incredibly disappointing and Mrs. Milne has not put all of the assets up for sale. That's a separate discussion with Mrs. Milne and her lawyers and the SEC, which we are engaging in. And Mr. Ginsberg is aware of that. There are some auctions set to go forward. That's one side of the equation.

The other side was we had a security interest in approximately $10 million worth of Mr. Milne's assets. They have given us information. I think we all agree that there is no blood left in those turnips any longer. There's no value to those.

1          The issue, however, that we come back to

2   with regard to the almost $409,000 paid to Mrs.

3   Milne is that we don't have a whole financial

4   disclosure from her as to all of her assets and her

5   accounts, but yet Mr. Milne is telling us all about

6   her expenses.  And he's given her over $400,000.

7          Our concern is that Mrs. Milne should be

8   paying her bills with her own money, not taking

9   $400,000 from her husband which could be used to pay

10  the SEC.  That's why we suggested perhaps a

11  meaningful payment of about $500,000.  That's

12  $400,000 he's given to Tara Milne that went into a

13  Fidelity investment account, plus 83,000 that he

14  just got as a bonus out of the blue.  That's roughly

15  $500,000.  It's two months to pay it.  That shows

16  some serious good faith on his part that he is

17  really trying to pay the debt.

18          And the other issue I wanted to raise

19  with the Court is that it's not up to us to

20  negotiate what he should pay.  It's his obligation

21  to pay everything that he can, and the records just

22  belie those efforts.

23          So I come back to, it's not our job to

24  beg for the money, it's his job to pay it, your

25  Honor.  And that's where we are.

1        MR. GINSBERG: Your Honor, we did -- I'm

2    not Mrs. Milne's lawyer, but I've been in touch with

3    them and I obtained from them the documents that I

4    could get, and I believe they provided documents.

5    It's not as if that money was put into her account

6    and it's sitting there. That's her source of

7    living, which includes in some instances medical

8    expenses. It includes all these other things that

9    have been discussed previously. And I don't want to

10   go through all of them. It's not like there's a

11   chunk of money sitting there for her to decide she's

12   going to go to Las Vegas for a weekend and spend

13   $10,000. That's what she lived on.

14        Now, if the question comes back to she

15   lived too well on that amount of money, that's a

16   different issue, I understand that, but I just don't

17   want your Honor to believe from what's being said

18   there's actually $400,000 sitting there which could

19   be turned over because, frankly, if there was

20   excess, we would do it.

21        We don't want to keep going through

22   this. I'm happy to appear before your Honor and

23   come up to New Haven, but we don't want to keep

24   doing this. If we had that 400,000 we would

25   definitely pay it, but she's used I think almost all

1    of it for her real actual expenses.

2              I've continued to speak to her lawyers,

3    to speak to her about tamping down what her expenses

4    are, and I think they have.  If there's more records

5    that the government needs in terms of showing where

6    that money was spent and they don't have it, I'll

7    reach out to her lawyer, Mr. Wolf, who I know.  But

8    I think they have it.  We produced -- I can't tell

9    you how many hundreds of thousands of pages of bank

10   records with checks, with explanations for the

11   checks.  And I think they did as well, that is, Mrs.

12   Milne's lawyer as well.

13             So if your Honor were to set this number

14   being bandied about, it's not there now, and I think

15   it would be not fruitful to pick a number like that

16   that's not realistic.  There are other ways to do

17   this.  But you can't take the pie chart and say

18   let's just take this money and plug it in.  It won't

19   work and we'll be back here, I fear, in two months

20   saying that money wasn't there.  He paid more than

21   the 25 percent, but he can't get up to the 400,000

22   or 500,000.

23             THE COURT:  You're saying this payment

24   to Mrs. Milne in the amount of $400,000 isn't there

25   anymore?

1          MR. GINSBERG:  It's money that went from

2     his earnings to her account and then she -- it's

3     money that she used to live on and spend, including

4     medical expenses.  And we provided all the checks

5     from those accounts to show where it was.  In fact,

6     I remember, I think it was the SEC was concerned

7     about three or four particular individuals who

8     received 7, 8, 9, 10, thousand dollars.  They didn't

9     know where it was going.  They addressed that to

10    Mrs. Milne's lawyers.  They got a response.  I think

11    most of those people were caretakers, and all of

12    that has been documented.  So it's not sitting

13    there.  It was provided to her over time and she

14    expended it over time for her expenses.  It's not

15    just sitting there to be used now.

16          MR. PICKERSTEIN:  And they, the

17    government, or the SEC certainly, has subpoenaed all

18    of Mrs. -- as I understand it, all of Mrs. Milne's

19    bank records and Fidelity records up to the end of

20    August.  They've got all these records.  They know

21    what went in, what went out.  There were caretakers

22    being paid.  All but one of those have been

23    terminated.  That's all I can do.

24          MR. McGARRY:  I just go back to I don't

25    know why it's okay when you promise to pay $5

1    million to settle a civil case, to settle a criminal

2    case, you plead, and part of the plea agreement is

3    you're going to make disgorgement, it becomes

4    conditions of supervised release.  You get $400,000,

5    you just send it to a Fidelity account and say:

6    Perhaps she lives too well, but I don't have it.

7    Sorry, government, sorry, SEC, I picked that over

8    this.  I made a conscious choice.  I did it every

9    month.  I'm violating my conditions of supervised

10   release.  And then Mr. Pickerstein stands up and

11   says, I don't know what I can do, Mr. McGarry's

12   being unreasonable.

13           It just doesn't seem unreasonable to me

14   when you promise to pay the federal government $5

15   million and you get $400,000 of it, you pay it

16   first.  And whether someone's mowing the lawn or

17   walking the dog or watching DirecTV, you stop doing

18   those things and you pay your bills.  And when it's

19   part of your condition of supervised release, you

20   should fear the power of the Court to say if I don't

21   pay this bill, I might go back to jail.

22           Turn off the TV.  Get the neighbor to

23   walk the dog.  Stop going to restaurants.  Let's not

24   have as cured a yard in Westport.  Let's pay the SEC

25   our level best and then call and ask for forgiveness

1    for more time.

2            It boggles the mind to say he sent it to

3    Mrs. Milne, perhaps she lived too well and we don't

4    have it anymore.  That's just a conscious decision

5    to violate the conditions of supervised release.

6    It's a conscious decision to put this Court's order

7    of disgorgement behind everything else, behind

8    DirecTV, behind the Mercedes, behind the dog walker.

9    And it just -- I think that's why a period of

10   incarceration might wake Ms. Milne up and say, He

11   went back again?  Why?  Gee, maybe I am living too

12   well.

13           And if the Court is not inclined to do

14   that, I respect the Court, but there's got to be a

15   dramatic change in the next two months.  And I

16   looked at Mr. Zampano's statement.  You know, you

17   put your expenses, and on the line, on page 3 or 4

18   of I think Form 48, it says "basic cable, no premium

19   channels" and you're supposed to write down your

20   expenses.  Okay?  If there's medical expenses of

21   $11,000 every month, which is in the paperwork as

22   well, we're still missing $300,000 somewhere.  If

23   you take it for a year, 11,000 times 12, it is

24   probably $131,000.  You're still missing, you know,

25   over, you know, $280,000.

1          So I just don't see why we keep coming

2     back to he doesn't have the money, he doesn't have

3     the money.  Here we have -- this is example two.

4     Example one was I've got $10 million of assets in

5     these companies, which we've now heard, well, they

6     lost value when I was incarcerated.  It was the

7     economy, they're now worthless.

8          Now we have $400,000 that he got from his

9     salary.  Well, I gave it to my wife, she spent it.

10    It's just -- it's just inconceivable that there's

11    not a sense of urgency to pay the SEC what you

12    promised the SEC, what you promised the federal

13    court.  And if the Court is inclined to continue

14    this for two months, then let's make sure that the

15    next two months are not like the previous 12 and

16    let's turn off some of the spigots at the Milne

17    house and have Mr. Milne be a big boy and say when

18    he gets a paycheck he's not going to send it all to

19    Mrs. Milne, she's going to have to dip into some of

20    her savings and pay herself, and he's going to

21    fulfill his promise to the SEC.

22          MR. PICKERSTEIN:  Tara has neither

23    savings nor a job.  That's Mrs. Milne.  She does not

24    work.  She is unable to work.  She is in constant

25    pain.  She requires a plethora of treatments;

physicians, drugs, and all of that. And you know
something? Mr. -- let's not snort when I'm talking.
It's very easy to say he should pay more, but he's
also got a responsibility to his wife and he's got a
responsibility to take care of his wife, and I think
he should be getting credit for that, not being
dragged through the mud.

Sure, there's some fat in there. I'm
not so stupid as not to be able to recognize that.
The majority of it today is not fat, your Honor,
it's necessary. She's uninsured, has no money, no
savings, no employment. No money, no savings, no
employment, and they're trying to make due. I
agree, she's living in Westport, Connecticut.
That's not a crime. Okay?

But I think beyond that, Mr. McGarry
goes a bit too far in making these accusations. And
he keeps repeating that Mr. Milne made a promise and
he's violated that promise. He admits that. But he
says there's a reason. "If I had the money, I'd pay
the money. I don't have the money." And he, like
everyone else in this economy, has suffered. And he
did not, by the way, make an effort to discharge
that liability. Dischargeable is an interesting
question, but he did not try to go the route of

bankruptcy or anything else.  He's living up to his

obligation the best he can, your Honor.  I just ask

that he be given the opportunity to continue.  And

he will continue.  He recognizes the importance of

that.  And believe me, he will walk out of here

today hopefully with a renewed recognition of his

responsibilities.

Thank you, your Honor.

THE COURT:  I am looking at the page you

gave me indicating the disposition of his funds.

We've got about $45,000 something in automobile

payments.

MR. PICKERSTEIN:  That's a different

one, your Honor.  No, the automobile payments are

$1,100 a month, if the Court please.

THE COURT:  I'm looking at what was

provided to me, this document.  It says:  Automobile

payments, $27,952 in Chase account.  Automobile

payments, Fidelity account, $13,976.

MR. ZAMPANO:  Your Honor, if I may, I

just wanted to clarify.  The expenditures that

you're looking at that were disclosed in the binder

from defense counsel are expenses from Mrs. Milne

while Mr. Milne I believe was incarcerated, from

2010 until 2012 or '13.  It was the spend-down from

the proceeds of the sale of the home, and everything

was itemized as to how she spent the proceeds of the

sale while he was incarcerated.  That's what her

expenses were while he was incarcerated.

        THE COURT:  I see.

        MR. ZAMPANO:  I believe the pie chart

shows -- from the SEC and defense counsel --

spending from that point to present.

        THE COURT:  Says from March 2010 to

February 2013.

        MR. ZAMPANO:  Correct.  That's

approximately when Mr. Milne was released.

        MR. PICKERSTEIN:  That's when Mr. Milne

was locked up, your Honor.

        MR. ZAMPANO:  Correct, during that time.

        THE COURT:  I really am in shock for

some of these expenditures.  Furnishings for the

home, $43,000.  That's absolutely ridiculous.

Groceries I understand.  Insurance I understand.  If

Mrs. Milne is disabled, she does need some home

health care.  However, we have well over $200,000

for that.  People have to cut back on their personal

expenditures to meet their obligations of what they

owe.

        MR. PICKERSTEIN:  That's the historic

1  picture, your Honor.

2         THE COURT:  I know, from 2010 through

3  2013.

4         MR. PICKERSTEIN:  What I'm representing

5  to the Court is from --

6         THE COURT:  March 2010 through

7  March 2013.

8         MR. PICKERSTEIN:  I'm representing

9  February 2013 to today.  That number is on a

10 significant downward slope.

11        THE COURT:  I hope so.

12        MR. PICKERSTEIN:  And will continue to

13 be on a significant downward slope.

14        THE COURT:  I think the best thing I can

15 do is to give Mr. Milne an opportunity to redeem

16 himself by continuing this hearing until November

17 and see what he does in the interim, what payments

18 are made in the interim to discharge his obligations

19 to the SEC, and, therefore, to the people of the

20 United States of America.

21        MR. PICKERSTEIN:  Very well, your Honor.

22 We are certainly happy about that.

23        THE COURT:  I think placing Mr. Milne in

24 custody at this point is counterproductive on that

25 issue.  Therefore, I would like to continue this

```
 1   matter until November.

 2              Patty, could you help me out with some

 3   dates?  Today is the 11th of September, a fateful

 4   day.  So how about November 11th?

 5              MR. McGARRY:  Veterans Day?

 6              MR. PICKERSTEIN:  I think that's a

 7   holiday, Veterans Day.

 8              THE COURT:  Okay, we're not coming back

 9   on Veterans Day.

10              MR. PICKERSTEIN:  I'm not asking that.

11              THE COURT:  Patty, can you give me a

12   date shortly thereafter?

13              THE CLERK:  November 12th.

14              MR. PICKERSTEIN:  Can I look on Patty's

15   calendar?

16              MR. McGARRY:  Probation suggested the

17   14th.

18              MR. ZAMPANO:  If it's possible.

19              THE CLERK:  That's a Thursday.  We have

20   a sentencing at 9:00 in the morning, and we might

21   have a trial then, the Morales case.

22              THE COURT:  How about the next day?

23              THE CLERK:  The 15th, we're available at

24   9:00.

25              MR. PICKERSTEIN:  Which is the Friday?
```

```
 1    That's fine.
 2                THE COURT:  Is that agreeable, Mr.
 3    McGarry?
 4                MR. McGARRY:  Yes, your Honor, fine with
 5    the government.
 6                THE COURT:  How about probation?
 7                MR. ZAMPANO:  Yes, your Honor.
 8                THE COURT:  You're happy with it?  The
 9    SEC's happy with it?
10                MS. MASSEY:  Yes, your Honor.
11                THE COURT:  In the meantime I suggest
12    your client make concerted efforts to comply with
13    his requirements.
14                MR. PICKERSTEIN:  In that respect, your
15    Honor, I renew my request with respect to travel on
16    notice to Mr. Zampano.
17                THE COURT:  Not going to Canada.
18                MR. PICKERSTEIN:  Your Honor, if he goes
19    to Canada, he's not coming back.  We've had that
20    discussion.  They won't let him back in, to tell you
21    the truth.  He's not doing that.
22                But I would like, your Honor, on notice,
23    travel throughout the continental United States so
24    he can really grow this business.  And growing the
25    business enures to everybody's benefit.
```

1          THE COURT:  Certainly anything that's

2   going to help him pay off his debt I agree with.

3   I'm not enthusiastic about his line of business.

4          MR. PICKERSTEIN:  Your Honor --

5          THE COURT:  But he's making money to pay

6   this back.

7          Mr. Zampano, do you have any problem

8   about his being able to travel?

9          MR. ZAMPANO:  Your Honor, I believe Ms.

10  Massey would like to add some clarification to the

11  request.

12         MS. MASSEY:  We don't disagree with the

13  Court in terms of the fact that if he has a job he

14  can pay, and we don't want to cut off our nose to

15  spite our face in that regard.  However, to the

16  extent he's traveling, it should be all of the

17  expenses are borne by the company, they don't come

18  by his personal account.  If he does travel for

19  clients at expensive places, he takes travel at

20  first class level, anything of that nature has to be

21  paid for by the company, it cannot come out of his

22  own money.

23         THE COURT:  I agree with that.

24         MR. PICKERSTEIN:  Your Honor, I have no

25  problem with that.  He will travel less than economy

1   class.  He will not entertain clients or potential

2   clients on the government's nickel.  He won't

3   entertain his lawyers on the government's nickel.

4   But I think it's important, your Honor, so he can go

5   to his bosses and say, look --

6               THE COURT:  We want him to make money so

7   he can make payments.  I want any travel that he's

8   doing, for Mr. Zampano to be notified in advance.

9               MR. PICKERSTEIN:  Are 48 hours

10  sufficient?

11              MR. ZAMPANO:  I want to give the

12  government notice in case there are any concerns.

13              MR. PICKERSTEIN:  No problem with that.

14              THE COURT:  The Court's interest here is

15  getting the government paid, and that's the way to

16  do it, apparently.  However, if we come back in

17  November and get further problems, I think we'd

18  suggest that he bring his toothbrush.  Okay?

19              MR. PICKERSTEIN:  Thank you, your Honor.

20              MR. ZAMPANO:  Your Honor, may I ask the

21  Court, I know a lot of information's been shared

22  here today, in terms of updating financials, just a

23  personal financial statement that probation has just

24  to show that Mr. Milne is in effect reducing his

25  monthly outflows and forwarding them to the SEC, if

we could have an updated personal financial

statement submitted say by the 1st of November so

that everybody has two weeks to review the

documentation?

MR. PICKERSTEIN:  We're happy to do

that, your Honor.

THE COURT:  Okay.

MR. PICKERSTEIN:  We're happy to do

that, your Honor.

THE COURT:  And dog walking, I suggest

that that can be done by the owner of the dog.

MR. PICKERSTEIN:  Yes, your Honor.

THE COURT:  Okay.  When we don't have

the money, sir, we shouldn't be spending it.  Okay?

We'll see you in November.

MR. PICKERSTEIN:  I hope to see you

before then.

MR. McGARRY:  Thank you for your time,

your Honor.

THE COURT:  All right.  Mr. Pickerstein,

as always, a pleasure.

MR. PICKERSTEIN:  Thank you, your Honor.

(11:48 o'clock a.m.)

1    I certify that the foregoing is a true
2  and correct transcript, to the best of my ability,
3  of the above pages of the stenographic notes
4  provided to me of the proceedings taken on the date
5  and time previously stated in the above matter.

6

7                              1/4/18
8                               Date

9

10                  /S/  Sharon Montini
11                    Official Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25